UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL H. ARNOLD, CHAPTER 11 TRUSTEE
OF CORNERSTONE HOMES INC.,

                    Plaintiff-Appellant,

                                                    Case # 16-CV-6012-FPG
v.

                                                    DECISION & ORDER

FIRST CITIZENS NATIONAL BANK,
THE COMMUNITY PRESERVATION CORPORATION,
AND ELMIRA SAVINGS BANK,

                    Defendant-Appellees.

In re:

CORNERSTONE HOMES, INC.,

                    Debtor.


        This bankruptcy appeal raises the following question: under New York law, does a

person have standing to enforce a mortgage and mortgage note where the note is a negotiable

instrument and that person obtained their interest in the note and mortgage through a written

assignment by the holder thereof, rather than through delivery and indorsement?  The United

States Bankruptcy Court for the Western District of New York (Warren, *B.J.*) answered yes.  *In

re Cornerstone Homes, Inc.*, 544 B.R. 492 (Bankr. W.D.N.Y. 2015).  This Court agrees.

Accordingly, the bankruptcy court's decision is affirmed.

# BACKGROUND[1]

## I.      Factual Background

In the years prior to its Chapter 11 filing, Cornerstone Homes, Inc. ("Debtor") purchased and renovated single-family homes throughout the Southern Tier of New York, subsequently selling or renting the renovated homes to high-risk borrowers.

During this time, Debtor obtained financing from numerous individuals (the "Individual Lenders").  In exchange for their "investment"[2] in Debtor's business, Debtor issued each of the Individual Lenders a promissory note payable to the order of the Individual Lender (the "Individual Lender Notes").  As security for the Individual Lender Notes, Debtor granted each of the Individual Lenders a mortgage (the "Individual Lender Mortgages") on a home owned by Debtor.  It is undisputed that the Individual Lender Notes are negotiable instruments.

Faced with the burden of servicing "returns" on the debt owed to the Individual Lenders, Debtor sought to refinance those obligations.  To that end, Debtor entered into a series of unrelated but structurally similar transactions.

First, on April 21, 2006, Debtor entered into a refinancing transaction with First Citizens National Bank ("First Citizens").  In connection with and to facilitate that transaction, certain Individual Lenders agreed to assign their Individual Lender Mortgages and Individual Lender Notes to First Citizens.  Each of these Individual Lenders executed and delivered a written Assignment of Mortgage, which stated that the Individual Lender "hereby assigns unto [First Citizens] . . . a certain mortgage made by Cornerstone Homes, Inc. . . . together with the bond or obligation described in said mortgage."  However, the Individual Lenders did not indorse or deliver the Individual Lender Notes to First Citizens.  Relying on the written assignments, First

---

[1]      The following background facts are undisputed and are drawn from the bankruptcy court's decision and the record before this Court on appeal.

[2]      As the bankruptcy court noted, "[s]ome might see the Debtor's 'business model' as very much resembling a Ponzi scheme—and that comparison has certainly been suggested by the Trustee."  *In re Cornerstone Homes, Inc.*, 544 B.R. at 496.

Citizens loaned $1,000,000 to Debtor pursuant to the terms of a Consolidation, Extension, and Modification Agreement ("CEMA") between Debtor and First Citizens.  The CEMA served to consolidate the Individual Lender Notes, Individual Lender Mortgages, and any additional financing provided by First Citizens such that the rights and obligations of Debtor and First Citizens were set out in a single "Consolidated Note" and a single "Consolidated Mortgage."

Then, on August 22, 2006, Debtor entered into a refinancing transaction with The Community Preservation Corporation ("CPC").   In connection with and to facilitate that transaction, certain Individual Lenders agreed to assign their Individual Lender Mortgages and Individual Lender Notes to CPC.  Each of these Individual Lenders executed and delivered a written Assignment of Mortgage, which stated that the Individual Lender "hereby assigns unto [CPC] . . . a certain mortgage made by Cornerstone Homes, Inc. . . . together with the bond or obligation described in said mortgage."  The Individual Lenders did not indorse or deliver the Individual Lender Notes to CPC.  Relying on the written assignments, CPC loaned $4,000,000 to Debtor.  Debtor and CPC agreed to consolidate the Individual Lender Notes, Individual Lender Mortgages, and any additional financing provided by CPC such that the rights and obligations of Debtor and CPC were set out in a single "Consolidated Note" and a single "Consolidated Mortgage."

Also on August 22, 2006, Debtor entered into another refinancing transaction with CPC. In connection with and to facilitate that transaction, certain Individual Lenders agreed to assign their Individual Lender Mortgages and Individual Lender Notes to CPC.   Each of these Individual Lenders executed and delivered a written Assignment of Mortgage, which stated that the Individual Lender "hereby assigns unto [CPC] . . . a certain mortgage made by Cornerstone Homes, Inc. . . . together with the bond or obligation described in said mortgage."   The Individual Lenders did not indorse or deliver the Individual Lender Notes to CPC.  Relying on

the written assignments, CPC loaned $4,800,000 to Debtor.   Debtor and CPC agreed to consolidate the Individual Lender Notes, Individual Lender Mortgages, and any additional financing provided by CPC such that the rights and obligations of Debtor and CPC were set out in a single "Consolidated Note" and a single "Consolidated Mortgage."

Next, on December 21, 2006, Debtor entered into a second refinancing transaction with First Citizens.  In connection with and to facilitate that transaction, certain Individual Lenders agreed to assign their Individual Lender Mortgages and Individual Lender Notes to First Citizens.  Each of these Individual Lenders executed and delivered a written Assignment of Mortgage, which stated that the Individual Lender "hereby assigns unto [First Citizens] . . . a certain mortgage made by Cornerstone Homes, Inc. . . . together with the bond or obligation described in said mortgage."  The Individual Lenders did not indorse or deliver the Individual Lender Notes to First Citizens.  Relying on the written assignments, First Citizens loaned $2,479,050 to Debtor pursuant to the terms of a CEMA between Debtor and First Citizens.  The CEMA served to consolidate the Individual Lender Notes, Individual Lender Mortgages, and any additional financing provided by First Citizens such that the rights and obligations of Debtor and First Citizens were set out in a single "Consolidated Note" and a single "Consolidated Mortgage."

Finally, on July 31, 2007, Debtor entered into a refinancing transaction with First Niagara Funding, Inc. ("First Niagara").  In connection with and to facilitate that transaction, certain Individual Lenders agreed to assign their Individual Lender Mortgages and Individual Lender Notes to First Niagara.  Each of these Individual Lenders executed and delivered a written Assignment of Mortgage, which stated that the Individual Lender "hereby assigns unto [First Niagara] . . . a certain mortgage made by Cornerstone Homes, Inc. . . . together with the bond or obligation described in said mortgage."  The Individual Lenders did not indorse or deliver the

Individual Lender Notes to First Niagara.  Relying on the written assignments, First Niagara

loaned $1,267,500 to Debtor pursuant to the terms of a CEMA between Debtor and First

Niagara.  The CEMA served to consolidate the Individual Lender Notes, Individual Lender

Mortgages and any additional financing provided by First Niagara such that the rights and

obligations of Debtor and First Niagara were set out in a single "Consolidated Note" and a single

"Consolidated Mortgage."

## II.    Procedural Background

Unable to satisfy its obligations to creditors as they became due, Debtor filed for

bankruptcy under Title 11, Chapter 11 of the United States Code on July 15, 2013.  On January

22, 2014, the bankruptcy court appointed Michael H. Arnold as the Chapter 11 Trustee

("Trustee") of Debtor.

On August 31, 2015, the Trustee commenced an adversary proceeding by filing a

complaint against First Citizens, CPC, and Elmira Savings Bank ("Elmira Savings")[3]

(collectively, the "Banks").  In its complaint, the Trustee sought a declaratory judgment that the

Banks are not entitled to enforce the Consolidated Mortgages and that the amount owed by

Debtor to the Banks under the Consolidated Notes is unsecured.  The Trustee moved for

summary judgment, followed by cross-motions for summary judgment by each of the Banks.

On December 23, 2015, the bankruptcy court issued a Decision and Order denying the

Trustee's motion for summary judgment, granting the Banks' motions for summary judgment,

and dismissing the Trustee's complaint.  *In re Cornerstone Homes, Inc.*, 544 B.R. at 494.  This

appeal followed.

---

[3]      Elmira Savings asserts that it is the successor-in-interest to First Niagara, who is not a party to this case.
For the sake of simplicity, and because the relationship between Elmira Savings and First Niagara is not at issue
here, this Court will refer to Elmira Savings as if it were the initial lending institution.

**STANDARD OF REVIEW**

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1).   In exercising appellate jurisdiction under that section, district courts review the bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error.   *In re: Sterling United, Inc.*, No. 14-MC-072S, 2015 WL 7573240, at *1 (W.D.N.Y. Nov. 25, 2015) (citing *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990)).   Here, the underlying facts are not in dispute and the Trustee only challenges the bankruptcy court's conclusions of law.   *See* ECF Nos. 5, 6, 7, 8.  Therefore, the appropriate standard of review is *de novo*.

**DISCUSSION**

**I.     The Trustee's Argument**

Under longstanding and well-established New York law,[4] "[a] mortgage is but an incident to the debt which it is intended to secure."   *Merritt v. Bartholick*, 36 N.Y. 44 (1867). Thus, a valid transfer of the debt carries the mortgage with it by operation of law, *Aurora Loan Servs., LLC v. Taylor*, 25 N.Y.3d 355, 361 (2015), but the inverse is not true.   Rather, "a transfer of the mortgage without the debt is a nullity, and no interest is assigned by it."   *Merritt*, 36 N.Y. at 44.

The Trustee contends that the Banks do not have a right to enforce the Consolidated Notes and Mortgages because they never acquired the underlying debt from the Individual Lenders.   More specifically, the Trustee's logic is as follows.   Because the Individual Lender Notes are negotiable instruments, Article 3 of the New York Uniform Commercial Code ("NYUCC") supplies the rules regarding who is entitled to enforce them.   Under the NYUCC, a written assignment is not sufficient to give the assignee the right to enforce the instrument; for

---

[4]     "State law governs the determination of property rights in a bankruptcy proceeding."   *In re Idicula*, 484 B.R. 284, 288 (Bankr. S.D.N.Y. 2013) (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)).   The parties agree that New York law applies here.   *See* ECF Nos. 5, 6, 7, 8.

instruments payable to order, such as the Individual Lender Notes, delivery and indorsement are required.  The Individual Lender Notes were never delivered or indorsed to the Banks.  When the Individual Lenders executed written assignments of the Individual Lender Notes and Mortgages, those assignments merely transferred the mortgage without the debt—which is a nullity under New York law.  Therefore, the Banks do not have standing to enforce the Individual Lender Notes and Mortgages or, by extension, the Consolidated Notes and Mortgages.

## II.    The Bankruptcy Court's Decision

The bankruptcy court was not persuaded by the Trustee's argument.  In particular, the bankruptcy court found that "[t]he Trustee's formulaic application of the NYUCC is not supported by the case law regarding standing to foreclose a mortgage."  *In re Cornerstone Homes, Inc.*, 544 B.R. at 504.  As the bankruptcy court noted, numerous courts have cited *U.S. Bank, N.A. v. Collymore*, 68 A.D.3d 752 (2d Dep't 2009) for the proposition that, under New York law, "a plaintiff has standing where it is both the holder *or assignee* of the subject mortgage and the holder *or assignee* of the underlying note at the time the action is commenced."  *Id.* at 753 (emphasis added); *In re Cornerstone Homes, Inc.*, 544 B.R. at 504 (collecting cases).

Because it is undisputed that the Individual Lenders did actually assign their rights in the Individual Notes and Mortgages to the Banks and that the Individual Lenders had the full panoply of legal rights with respect to the Individual Lender Notes and Mortgages when they did so, the bankruptcy court found that the Banks have standing to enforce the Individual Lender Notes and Mortgages—and, by extension, the Consolidated Notes and Mortgages—under New York law.  *In re Cornerstone Homes, Inc.*, 544 B.R. at 504-05.

### III.   Analysis

On appeal, the Trustee argues that the bankruptcy court erred by relying on *Collymore* and its progeny—which the Trustee characterizes as weak authority and at odds with the requirements of delivery and indorsement plainly set forth in Article 3 of the NYUCC.[5] However, this Court rejects the Trustee's premise that the *Collymore* rule is necessarily at odds with the NYUCC.   In fact, as explained below, the best interpretation of the NYUCC is one in which written assignment of a negotiable instrument may be sufficient to give the assignee the right to enforce that instrument.

Article 3 of the NYUCC provides a series of rules regarding negotiable instruments.   For a writing to qualify as a negotiable instrument, it must (a) be signed by the maker or drawer; (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power; (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer.   NYUCC § 3-104(1).   It is undisputed that the Individual Lender Notes are negotiable instruments "payable to order" of each Individual Lender.

Under the NYUCC, there are two principal ways in which a third party may obtain the right to enforce a negotiable instrument.   The first is "negotiation."   NYUCC § 3-202. "Negotiation is the transfer of an instrument[6] in such form that the transferee becomes a holder.[7] If the instrument is payable to order it is negotiated by delivery[8] with any necessary indorsement; if payable to bearer it is negotiated by delivery."   NYUCC § 3-202(1).   The holder of a

---

[5]      The Trustee also argues that the bankruptcy court erred by stating in its decision that the Banks were "fully secured."   ECF No. 5, at 26-27; *see In re Cornerstone Homes, Inc.*, 544 B.R. at 507.   The Banks do not respond to this argument.   ECF Nos. 6, 7, 8.   This Court does not view the bankruptcy court's decision as a final order regarding this issue, and therefore will not address it in this decision.   *See* 28 U.S.C. § 158(a)(1) (providing that federal district courts have jurisdiction to hear appeals "from final judgments, orders, and decrees").

[6]      The word "instrument" as used in Article 3 of the NYUCC refers to a "negotiable instrument."   NYUCC § 3-102(1)(e).

[7]      To be the "holder" of a negotiable instrument, a person must be in possession of that instrument and the instrument must be "issued or indorsed to him or to his order or to bearer or in blank."   NYUCC § 1-201(20).

[8]      The term "delivery" is defined as the "voluntary transfer of possession."   NYUCC § 1-201(14).

negotiable instrument has the right to enforce payment of that instrument and is entitled to a presumption of ownership, meaning that any party objecting to the holder's rights faces the initial burden of proof. *See* NYUCC §§ 3-301, 3-307. Here, it is undisputed that the Individual Lender Notes were never delivered or indorsed to the Banks as is required for proper negotiation under section 3-202. Therefore, the Banks cannot be considered "holders" of the Individual Lender Notes.

Second, a transfer that does not amount to a negotiation—and therefore does not make the transferee a holder—may still give the transferee a right to enforce the instrument, so long as the transferor had that right. Section 3-201 provides that "transfer of an instrument vests in the transferee such rights as the transferor has therein." NYUCC § 3-201(1). In other words, "[a]ny person who transfers an instrument transfers whatever rights he has in it." NYUCC § 3-201 cmt. 1. Here, it is undisputed that the Individual Lenders had the right to enforce their Individual Lender Notes at the time they executed written assignments in favor of the Banks. However, unlike the section on negotiation, section 3-201 does not list any prerequisites for "transfer" or otherwise describe how a transfer occurs. The parties have not pointed to, and this Court is not aware of, any decision by the New York Court of Appeals that has settled this question. With that in mind, this Court's job is to predict how the New York Court of Appeals would interpret section 3-201 of the NYUCC. *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity.").

Several considerations weigh in favor of interpreting the NYUCC to allow for written assignment as a proper form of transfer under section 3-201. First, the lack of any listed prerequisites differs sharply from the section on negotiation, which specifically requires delivery

for an instrument payable to bearer and both delivery and indorsement for an instrument payable to order.  NYUCC § 3-202.  If the legislature had intended to require delivery for all transfers, presumably they would have used similar language in section 3-201.  By not using such language, the legislature may have intended the term "transfer" under section 3-201 to be a catch-all for otherwise valid conveyances that do not satisfy the prerequisites for negotiation under section 3-202.

Second, as the bankruptcy court noted, New York appellate and trial courts consistently cite *Collymore* and state that "a plaintiff has standing where it is both the holder *or assignee* of the subject mortgage and the holder *or assignee* of the underlying note at the time the action is commenced."  *In re Cornerstone Homes, Inc.*, 544 B.R. at 504 (collecting cases).  These cases often further state that "*either* a written assignment of the underlying note *or* the physical delivery of the note prior to the commencement of the foreclosure action is sufficient to transfer the obligation."  *See, e.g.*, *Collymore*, 68 A.D.3d at 753 (emphasis added); *In re Cornerstone Homes, Inc.*, 544 B.R. at 504 (collecting cases).  The NYUCC provides that "[u]nless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."  NYUCC § 1-103.  Thus, cases such as *Collymore* may be seen as supplementing the NYUCC and providing that written assignment is a valid form of transfer under section 3-201.  *See In re Verna*, No. 14-10821, 2015 WL 5193412, at *5 n.10 (Bankr. N.D.N.Y. Sept. 4, 2015) ("Because the UCC does not define the types of conveyances that constitute a valid transfer, New York courts have filled in the UCC's gaps by equating

'transfer' with 'assignment.'"), *appeal denied, judgment aff'd sub nom. Verna v. U.S. Bank Nat'l Ass'n*, No. 1:15-CV-1127, 2016 WL 5107115 (N.D.N.Y. Sept. 20, 2016).[9]

Third, the New York legislature has not adopted a proposed revision to the UCC that would clearly require delivery.  Article 3 of the UCC was revised in 1990 and amended in 2002.  Under section 3-203 of the revised UCC, "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."  U.C.C. Text § 3-203.  "Except for New York, every state (as well as the District of Columbia, Puerto Rico, and the United States Virgin Islands) has enacted either the 1990 Official Text of Article 3 or the newer 2002 Official Text."  Report of the Permanent Editorial Board for the Uniform Commercial Code, Application of the Uniform Commercial Code to Selected Issues Relating to Mortgage Notes (2011) [hereinafter "UCC Report"], at 2 n.6.[10]  Had the New York legislature intended to limit "transfer" of a negotiable instrument to situations in which the transferee received physical delivery of the instrument, it would have adopted section 3-203 of the revised UCC.   It is also important to note that the New York Court of Appeals has employed this same logic in the past regarding other provisions of Article 3 of the NYUCC.  *See Mouradian v. Astoria Fed. Sav. & Loan*, 91 N.Y.2d 124, 130-31 (1997) (comparing section 3-419(2) of the NYUCC to section 3-420(2) of the revised UCC).

A fourth consideration weighing in favor of accepting written assignment as a form of transfer under section 3-201 of the NYUCC is that this interpretation would be in line with New

---

[9]      The Trustee points out that the vast majority of cases citing the language from *Collymore* either (1) involve plaintiffs who were actually holders of the underlying debt through proper indorsement and delivery; (2) involve plaintiffs who did not have standing to enforce the underlying debt; or (3) do not specify whether the underlying debt is a negotiable instrument. ECF No. 5, at 16-26.  While the dearth of case law specifically holding that written assignment of a negotiable instrument is a valid form of transfer under section 3-201 may detract somewhat from the weight of those cases, it does not completely drain them of their interpretive power.  Other courts, both state and federal, have viewed *Collymore* and its progeny as applicable to the law of negotiable instruments and the interpretation of Article 3 of the NYUCC.  *See Bank of N.Y. Mellon v. Deane*, 970 N.Y.S.2d 427, 433 (Sup. Ct. 2013); *In re Verna*, 2015 WL 5193412, at *5 n.10; *In re Hilton*, 544 B.R. 1, 12 (Bankr. N.D.N.Y. 2016).  This Court adopts that same approach here.

[10]      *See also* Uniform Law Commission, http://www.uniformlaws.org/Act.aspx?title=UCC%20Article%203,%20Negotiable%20InstrumeIns%20%281990%29 (last visited November 15, 2016).

York's Real Property Law statute ("RPL").  For example, the RPL mandates that "words of assignment" in an assignment of a mortgage and note "must be construed as having included in their meaning that the assignor does thereby make, constitute and appoint the assignee the true and lawful attorney, . . . to have, use and take all lawful ways and means for the recovery of the money and interest secured by the said mortgage and bond or mortgage and note."  RPL § 254(9).  The RPL also includes a sample Assignment of Mortgage that mirrors the written assignments executed by the Individual Lenders in this case.  RPL § 258, Schedule O.  Section 275 of the RPL, meanwhile, states that the full amount of a mortgage "shall not be considered to be paid whenever such mortgage continues to secure a bona fide debt and an enforceable lien continues to exist."  RPL § 275(2).  The statute then lists situations where the mortgage continues to secure a *bona fide* debt, including "the refinancing of an existing loan with a new lender, such as where the original lender *assigns* a note and the mortgage securing its payment to another lender in return for consideration and such mortgage is consolidated with another mortgage which secures any funds advanced by the new lender to the mortgagor."  RPL § 275(2)(c) (emphasis added).  If this Court were to hold that a written assignment is insufficient to constitute a transfer under section 3-201 of the NYUCC, the effect would be to invalidate a transaction specifically envisioned and authorized under the RPL.

Lastly, it is important to consider the purpose behind rules governing who may enforce a negotiable instrument.  "The rules that determine who is entitled to enforce a note are concerned primarily with the maker of the note, providing the maker with a relatively simple way of determining to whom his or her obligation is owed and, thus, whom to pay in order to be discharged."  UCC Report, at 8.  Thus, a delivery requirement makes sense in situations where the holder of a note—unbeknownst to the maker of that note—intends to give a third party the right to enforce it.  But here, there is no indication that Debtor was ever confused or uncertain

about whom to pay to discharge its debt; in fact, it appears that Debtor was fully aware of the written assignments and used them to facilitate refinancing transactions with the Banks. Reading section 3-201 of the NYUCC to require delivery in this case would run counter to the purpose behind delivery requirements in general, and would provide a substantial windfall to Debtor.

On the other hand, there are also considerations that weigh *against* interpreting the NYUCC to allow for written assignment as a proper form of transfer. For example, section 3-306 states that unless a person has the rights of a holder in due course,[11] that person takes an instrument subject to certain claims and defenses, including the defense of "non-delivery." NYUCC § 3-306(c). Although it is odd to speak of a transferee who has validly acquired an instrument by written assignment and yet is subject to a non-delivery defense, it is important to keep in mind that section 3-306 applies not just to transferees but also to holders who are not holders in due course. A plaintiff claiming that he or she is the holder of an instrument through the process of negotiation, for example, would certainly be subject to the defense of non-delivery. *See* NYUCC § 3-202 (requiring delivery for all negotiations).

Further, some of the Official Comments accompanying the NYUCC could be read to suggest that all transferees have physical possession of the instrument. Section 3-201, regarding transfer, states that a transferee of an unindorsed instrument generally has the right to an indorsement, but "[n]egotiation takes effect only when the indorsement is made." NYUCC § 3-201(3). One of the Official Comments to that section explains that because negotiation has not yet taken place, such a transferee "must account for his possession of the unindorsed paper by proving the transaction through which he acquired it." NYUCC § 3-201, cmt. 8.

---

[11]     A "holder in due course" is a holder who takes the instrument (a) for value; (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. NYUCC § 3-302(1). Holder in due course status is important because it generally shields that person from all claims and defenses. *See* NYUCC § 3-305.

Section 3-307 provides that "[w]hen signatures are admitted or established, *production* of the instrument entitles a holder to recover on it unless the defendant establishes a defense." NYUCC § 3-307(2) (emphasis added).  Official Comment 2 explains that this provision "applies only to a holder, as defined in this Act (Section 1-201.)  Any other person in possession of an instrument must prove his right to it and account for the absence of any necessary indorsement." NYUCC § 3-307, cmt. 2.

Although the language in both of these Official Comments could be read to support an interpretation of section 3-201 that would require delivery for all transfers, there are other reasonable interpretations of that same language.  For example, both of the Official Comments could apply only to situations where the plaintiff alleges that he or she is a holder of the instrument by way of a negotiation (which does require delivery).

Lastly, allowing for transfer by written assignment could create confusion for the maker of an instrument in certain circumstances.  Section 3-301 provides that "the holder of an instrument *whether or not he is the owner* . . . may enforce payment in his own name."  NYUCC § 3-301 (emphasis added).  If a holder transfers an instrument by written assignment but remains the holder of the instrument, then both the holder and the transferee would have the right to enforce the instrument against its maker.  The holder of an instrument could also transfer that instrument by way of written assignment, but then negotiate the same instrument to another person who becomes the holder in due course.  *See* NYUCC §§ 3-202, 3-302.  In that scenario, both the transferee and the holder in due course would have the right to enforce the instrument against its maker.  Because the holder in due course generally takes the instrument free from all claims and defenses, *see* NYUCC § 3-305, the maker would not be able to fully discharge its obligation by paying the transferee.  Again, however, it is important to note that there is no such

confusion in this case; Debtor utilized the written assignments to facilitate its own refinancing transactions with the Banks.

This Court finds that the best interpretation of the NYUCC is one in which a written assignment is sufficient to constitute a transfer under section 3-201.  The considerations in favor of a delivery requirement are outweighed by the strong considerations in favor of allowing for transfer by written assignment.  Reading a delivery requirement into section 3-201 would unduly prioritize form over substance and would not be in keeping with this Court's role in this case, which is to predict how the New York Court of Appeals would interpret the NYUCC.

It is undisputed that the Individual Lenders assigned their rights in the Individual Lender Notes and Mortgages to the Banks, that each assignment unambiguously referred to both the mortgage and the underlying note, and that the Individual Lenders had the right to enforce the Individual Notes and Mortgages (and the right to assign such an interest) when they executed the written assignments.  Therefore, the Banks have standing to enforce the Individual Lender Notes and Mortgages—and, by extension, the Consolidated Notes and Mortgages—under New York Law.

## CONCLUSION

For the reasons stated above, the bankruptcy court's decision is AFFIRMED.  The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: November 18, 2016
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court